TEALL and others *vs.* SEARS & GRIFFITH.

On the 6th of October, 1846, the plaintiffs shipped, at Albany, three cases of goods for Buffalo, on a canal boat. A bill of lading was made out by the plaintiffs, and forwarded by the captain of the canal boat, with directions to deliver the goods in the bill as addressed, and collect the charges for transporting on the canal. The three cases were marked, on the bill, "A. B. Case, Chicago, by vessel, care of Sears & Griffith, Buffalo." The cases were received by Sears & Griffith, (the defendants,) at Buffalo, on the 14th of October, and they paid the canal charges, indorsing a receipt therefor, and a memorandum of the receipt of the goods, on the bill of lading. The defendants were at the time engaged in the forwarding and commission business, at B. That was their principal business, but they were interested to some extent in a transportation line, on the canal, and also in at least one vessel carrying freight upon the lakes. On the 17th of October the defendants shipped the goods on board the schooner C. a transient vessel, which ran between Buffalo and Chicago, in which they had no interest. They took the captain's receipt, and made a bill of lading for the goods, agreeing with the captain as to the amount of freight he should receive. The vessel was a good one, and her captain in good credit. In an action against S. & G. to recover the value of one of the cases of goods, which was lost, and not delivered at Chicago,

*Held* 1. That the legal import of the memorandum was, not that the goods should be stored at Buffalo, and that the defendants should act as agents of the plaintiffs in procuring a carrier of them from Buffalo to Chicago; but that they were consigned to the defendants at B., with a request or direction that they should be carried, by vessel, from B. to Chicago.

2. That the defendants, receiving the goods, with the accompanying memorandum, and transporting or causing the same to be transported, by vessel, to Chicago, were to be regarded as impliedly contracting to carry; and that upon such receipt the risk of a *carrier*, and not that of a *warehouseman* or *forwarder*, attached.

CASE, brought against the defendants as common carriers, for the loss of a case of goods. The plea was the general issue.

The cause was tried before Justice Parker, at the Albany circuit, in December, 1848, and by consent of parties a verdict for $112 was taken for the plaintiffs, subject to the opinion of the court. It appeared on the trial that, at Boston, in September or October, 1846, three cases of goods marked "A. B. Case,

Chicago," were delivered to the plaintiffs. Two of the cases only arrived at Chicago, their place of destination. The other case was not delivered. It contained thirty-three dozen of clothes brushes.

On the 6th of October, 1846, the plaintiffs shipped at Albany the three cases of goods, for Buffalo, on board the canal boat McAllister. A shipping bill, or bill of lading, was made out by the plaintiffs and forwarded by the captain of the boat, with directions to deliver the goods in the bill as addressed, and collect the charges for transporting on the canal. The three cases were marked, on the bill, "A. B. Case, Chicago, by vessel, care of Sears & Griffith, Buffalo." The cases of goods were received by the defendants at Buffalo, on the 14th October, and they paid the charges for transporting on the canal to Buffalo, indorsing a receipt therefor, and a memorandum of a receipt of the goods, on the shipping bill. The defendants were at the time engaged in the forwarding and commission business at Buffalo. That was their principal business, but they were interested to some extent in Griffith's Western Transportation Line, on the canal, and also in at least one vessel called the Racine, carrying upon the lakes. On the 17th October, 1846, the defendants shipped the three cases of goods on board the schooner Champion, which ran between Buffalo and Chicago, and the next day took the captain's receipt for them, on their bill of lading book. They made a bill of lading for the goods up the lake. The schooner Champion was a transient vessel, in which the defendants had no interest, nor had they a controlling interest in the Racine. And although the latter vessel ran during all the season of 1846, she carried but one load for the defendants that season. The defendants mostly forwarded west, on the lakes, by transient vessels. The defendants' charges for receiving and forwarding goods in 1846 upon the lakes, were six cents per hundred. The current rates of freight for carrying goods that season from Buffalo to Chicago, were twenty shillings per tun, and this was the price that the defendants agreed with the captain should be paid on the goods in controversy. The goods in question were not sent to Buffalo in Griffith's Western Line. The schooner Champion was a good vessel, and her captain in good credit.

Teall *v.* Sears.

*Wm. Barnes*, for the plaintiffs. I. The defendants are common carriers of these goods, because they employed and paid the schooner Champion, on which they were transported, took a receipt from the captain for the goods, and had a lien on them for their carriage from Buffalo to Chicago and for previous charges, and were alone authorized to collect the freight and previous charges, and were engaged generally in the transportation business, and interested in boats and vessels on the canal and lakes. II. The defendants having given a *bill of lading* for these goods from Buffalo to Chicago, are estopped from denying their character as common carriers. A bill of lading is never given by any person but a common carrier, and is the peculiar and distinctive feature of the character. III. The defendants by *their receipt on the bill of lading*, according to commercial usage and the law as applicable to bills of lading, agreed to carry the goods from Buffalo to Chicago in the capacity of common carriers; and hence are liable for their value.

*A. Taber*, for the defendants. I. The evidence shows clearly that the defendants were not common carriers of the three cases of brushes in question, but that they received them as *forwarders, undertaking, for a compensation, to procure them to be carried by others*, and *having themselves no interest in the freight;* that they did in due time deliver them, on board a good vessel to a responsible carrier, to be taken to their place of destination. II. After doing all this, a forwarding merchant has discharged his whole duty, and is no longer responsible for the safe delivery of the goods. He is not by law a common carrier, nor liable as such. III. The bill brought by the carrier on the canal, to the defendants, with the goods in question, and the receipt indorsed thereon by the clerk of the defendants, are entirely consistent with their character as *forwarders*. The goods were to go to " A. B. Case, Chicago, by vessel," and for this purpose were sent to the " care" of " Sears & Griffith, Buffalo," and the latter did so send them by *vessel*. If they had received the goods as carriers, a bill of lading or carriers' receipt would have been required. (*Story on Bailments,* § 556, *4th edition.*)

Teall *v.* Sears.

IV. The fact that the defendants owned an interest, in common with others, not parties to this suit, in a vessel called the Racine, on board of which these goods were *not* sent, nor did the defendants run her, but on board of which they had *once* sent some other goods, paying freight therefor to the person who *did* run her, has not the remotest bearing on any question in this cause. Judgment should be rendered for the defendants.

*By the Court*, WRIGHT, J. There is but a single point in this case, viz. Were the defendants common carriers of the three cases of goods from Buffalo to Chicago? If they were not, but were merely acting in the capacity of warehousemen and forwarders, they are not liable. As bailees of the latter character, they would only be liable for ordinary neglect, of which there is no pretense.

There is, especially in this country, a class of persons who usually combine in their business the double character of warehousemen and agents for a compensation, to ship and forward goods to their destination. They are especially employed on our canals, railroads, rivers and lakes, and in our coasting navigation by steam vessels and other packets. (*Story on Bailments*, § 444, (2).) Their business is to receive and forward goods, taking upon themselves the expenses of transportation, for which they receive a compensation from the owners, but who have no concern in the vessels or wagons by which they are transported, and no interest in the freight. (*Story on Bailm.* § 502.) Confining their operations within the strict limits of their business, they are deemed mere warehousemen and agents of the owners to procure the goods to be carried by others, and not the carriers themselves. Under some circumstances, however, it becomes a matter of nicety to decide whether they are acting in the capacity of forwarders or carriers, and in what character they are or may be chargeable with the loss which occurs; whether their employment as that of agents of the owners to procure or contract for the carrying of the goods, or implied contractors themselves for such carriage.

The defendants contend that the facts of this case leave no doubt of the character in which they acted; that they were but

Teall v. Sears.

warehousemen and forwarders, and that no contract to carry can be implied from their acts. Consequently, that in the latter capacity they can not be charged with the loss. The plaintiffs maintain the converse of this proposition. It becomes necessary, therefore, that we should examine the circumstances closely, with the view of determining the special character in which they may be made liable.

That the three cases of goods were received by the defendants, at Buffalo, and that one of them was never delivered at Chicago, its place of destination, is not disputed. Under what circumstances were the cases received by the defendants? The plaintiffs, on the 6th of October, at Albany, shipped them on board a canal boat to be transported to Buffalo. A bill of lading or shipping bill, accompanied them. The bill contained this entry. "Three cases of goods, A. B. Chase, Chicago, by vessel, care of Sears & Griffith, Buffalo." There was also an entry on the bill of the charge for freight to Buffalo, and freight by vessel from Boston to Albany, with a direction to the captain of the canal boat to deliver the goods as addressed and collect the charges noted. The memorandum, therefor, in the shipping bill, designated the ultimate consignee and place of destination of the goods; the persons to whom they were consigned at the western "terminus" of the canal; a request or direction of the plaintiffs that they should be carried from Buffalo to Chicago by vessel; an entry of charges for freight, from Boston and on the canal; and a direction to the captain to collect such charges. The goods were taken to Buffalo, and this memorandum shown to the defendants. They received and took charge of the goods, and it is to be presumed according to the terms of the memorandum. That did not ask that the goods should be stored at Buffalo, nor can it strictly be construed as a request to the defendants to act as agents for the plaintiffs to procure a carrier of the goods from Buffalo to Chicago. The defendants' principal business at the time was, according to the understanding of the only witness, that of forwarders, though they had some interest in a line of canal boats, and in one vessel at least, carrying on the lakes. The goods were received and the bill of lading from Albany re-

Tcall *v.* Sears.

ceipted by the defendants, on the 16th of October, and on the following day they shipped them on board a vessel running between Buffalo and Chicago, and took the captain's receipt for the goods on their bill of lading book.

The legal import of the memorandum was, not that the goods should be stored at Buffalo, and that the defendants should act as agents of the plaintiffs in procuring a carrier of them from Buffalo to Chicago; but that they were consigned to the defendants at Buffalo, with a request or direction that they should be carried, by vessel, from the latter place to Chicago. It seems plain to me that whoever received the goods, with this accompanying memorandum, and transported or caused the same to be transported, by vessel, to Chicago, are to be regarded as impliedly contracting to carry; and that upon such receipt the risk of a carrier, and not that of a warehouseman or forwarder, attached.

Again; the day following the receipt of the goods by the defendants, they employed and paid the schooner Champion, on which they were transported, and took the captain's receipt for them in what is called their bill of lading book. It is true that they had no interest in the vessel, as owners. It is not absolutely necessary that the carrier should own, or be interested as owner, in the vessel on which the goods are carried. He may hire, generally or for a specific purpose, and be interested in the freight. I do not think this a case where the defendants contracted as the agents of the plaintiffs, with the captain or owners of the Champion to carry the goods, and in which the latter would have had a lien upon them for their carriage. It is rather a case in which the defendants assumed the carriage themselves, hiring the service of the vessel for the specific purpose, paying previous charges for transportation, assuming the freight upon the lakes, giving a bill of lading for the goods, and having a lien, and alone able to collect the freight for their carriage to Chicago, and previous charges. None of these acts necessarily show that they were acting only as agents of the plaintiffs in procuring their goods to be forwarded to their destination. On the other hand, the reception of the goods at Buffalo, agreeably to the direction

of the memorandum accompanying them, the employing of the schooner Champion, taking a receipt for the goods from the captain, in what is called their bill of lading book, and giving a bill of lading, themselves, of the goods, leave little doubt that they were acting in the character of carriers.

We are referred to *Roberts* v. *Turner*, (12 *John.* 232,) as controlling this case. That case was decided in 1815. But without referring to the actual condition of the business of the country, since that decision, the case is distinguishable from the present. In that the whole facts showed that Turner acted but as a forwarder of the goods. He kept a store at Utica, where produce was left by the public to be forwarded by boats or wagons to Albany. He had no interest in the boats or wagons. The plaintiff knew, when his ashes were left to be sent to Albany, that Turner's only business in relation to the carriage of goods, consisted in forwarding them. This was also understood by the public; and that without any concern in the vessels by which the goods were forwarded, or any interest in the freight, they were stored with him merely for the purpose of forwarding by others; he taking upon himself the expenses of transportation, for which he received a compensation from the owners of the goods. But this was not the position of the defendants in the present suit. They were in a measure engaged in the carrying business, and were interested to some extent in vessels on the canal and lakes. They kept a public office for the transaction of their business, at a place of transhipment, receiving and carrying all goods that might be directed to their care, in their own vessels when convenient, and in such other vessels as they could employ on terms most advantageous to themselves. They received the goods in question, directed to them, which were destined west on the lakes. They employed a vessel to carry them forward, making out a new freight bill and returning the old one, and for themselves, taking the captain's receipt for the goods.

Persons ostensibly engaged as forwarders have, in this state, become numerous, and their business complicated and extensive. The rigid rules of the common law make the carrier assume the liability of an insurer of property, whilst the warehouseman and

forwarder are but answerable as bailees, for ordinary neglect. The law distinctly defines the business of each, and their liabilities. Whilst the warehouseman confines himself to the receipt and storage of goods, for a compensation, and a forwarder to the receipt of goods and the forwarding of them by a carrier other than himself, in good credit and in safe vessels, they only assume the liability of depositaries for hire. But if, calling themselves forwarders, they so act and conduct their business as to lead the public to regard them as carriers, and employ them as such, without intimation of their true character, the liabilities of a carrier attach to them.

Judgment for the plaintiff.

---

Same Term.    *Before the same Justices.*