WILLIAM M. TEBO, Appellant, v. HENRY G. JORDAN, and Others, Respondents.

*Tug chartered to tow coal barges — liability of the owner of the tug for the negligence of his captain — evidence as to negligence on a voyage — stranding on shoals.*

The owner of a steam tug chartered it, with his officers and crew, to the owner of coal barges, at a fixed rate per month, to tow barges between Newport News and Boston, under a charter-party which provided that, in its execution, the dangers of the sea should be excepted, and the tug not be held responsible for damages from that cause.

The tug and its tow having stranaed on certain shoals while on a voyage to Boston, and remained aground for about an hour, the charterer claimed the right to terminate the contract; and the tug owner, having brought an action for the month's hire, was resisted on the ground of damages to the barges alleged to have been caused by their stranding through the negligence of the captain of the tug.

*Held*, that, under the charter-party, the law implied a warranty by the owner that the tug was seaworthy.

That a vessel which is not commanded by competent officers is unseaworthy.

That the owner of the tug, while not a common carrier and liable as an insurer of the safety of the barges, was liable for damages occasioned by the failure of the master of the vessel to exercise reasonable care and skill in its management.

The evidence on the questions as to whether the captain of the tug was negligent in not anchoring, instead of proceeding by night, at a point where the course lay between certain shoals, on one of which the tug and barges stranded, and in not sounding between the shoals, examined and *held* not to sustain a ruling that the captain was negligent, as matter of law, but to present questions of fact which should have been submitted to the jury.

Appeal by the plaintiff, William M. Tebo, from a judgment of the Supreme Court, in favor of the defendants, entered in the office of the clerk of the city and county of New York on the 10th day of May, 1892, on a verdict for the defendants directed by the court at the New York Circuit.

The plaintiff was the owner of the steam tug B. T. Haviland, and the defendants were partners under the name of H. G. Jordan & Co., and engaged in the transportation of coal in barges from Newport News, New York and Philadelphia to Boston and other ports in the New England States. October 23, 1888, the parties to this action entered into a contract of which the following is a copy:

" Articles of agreement entered into this 23d day of October, 1888, between H. G. Jordan & Co., of Boston, Mass., and W. M. Tebo,

·of Brooklyn, L. I. The said W. M. Tebo agreed to charter the steamer B. T. Haviland to said H. G. Jordan & Co., from the morning of October 26, 1888, to May 1, 1889 (either party having the privilege of cancellation upon one month's notice), to tow their coal barges from New York, Philadephia or Newport News to Boston or ·some other safe port not east of Portland, Me.

" The steamer to be provided with a hawser on board, and, in cases of parting the barge's hawser, to use the same for the balance ·of the trip free of cost to Messrs. Jordan & Co. When the steamer is in New York and obliged to wait for barges to tow, the Messrs. ·Jordan have the privilege of sending the tug to Sandy Hook seeking. The steamer is expected to go at all times when, in the judgment of the captain, it is prudent and safe for his boat and tow.

" Two days in each month to be allowed for washing and cleaning ·out boiler. In the event of the boat becoming disabled in machinery the lost time to be at the expense of charterers. Payments to be made on the first day of every month to W. M. Tebo for the amount ·of each month's charter. The price to be twenty-two hundred dollars ($2,200) per month. In the execution of this charter the ·dangers of the sea excepted and the tug not held responsible for ·damages from that cause.

" A representative of Messrs. Jordan & Co. to be on the tug at any time when they see fit and free of cost to the tug, excepting food which the tug is to supply.

" W. M. TEBO,

" *Haviland,*

" Witness to both signatures :    " H. G. JORDAN & CO.
"E. R. DUNHAM."

December 2, 1888, the tug, while towing defendants' barges Charter Oak and George Moon, laden with coal, from Newport News *via* New York to Boston, was, with the barges, stranded at about six o'clock in the evening on Handkerchief shoals, remaining aground about an hour. At about six P. M. on the next day the barges were stranded in Boston harbor and remained aground for about an hour. By these strandings the barges were injured in the amount of $1,167.64, but the greater part of the injury was caused by the first stranding. Handkerchief and Shovelful lights

are about three and a half miles apart, the latter being north-easterly from the former. Monomoy light is about a mile, and a little west of north, from Shovelful light. The channel from Handkerchief to Shovelful light is narrow, with dangerous shoals on each side.

The defendants used the tug from October 26, 1888, to December eighth of the same year, when they ceased to use it and wrote the plaintiff as follows:

"Wm. Tebo, Esq.: "Dec. 8th, 1888.

"Dear Sir. — On behalf of H. G. Jordan & Co., of Boston, we are instructed to notify you that the tug 'B. T. Haviland' will not be employed by them after this date on account of the stranding on December 2, 1888, and other injuries received by the tows while under charge of said boat.

"Very respectfully,
"WING, SHOUDY & PUTNAM."

The plaintiff replied as follows:

"Brooklyn, Dec. 12, 1888.
"Messrs. Wing, Shoudy & Putnam:

"Gentlemen. — In answer to your notification on behalf of Messrs. H. G. Jordan & Co., of Boston, of the discharge of my tug B. T. Haviland from Dec. 8th, 1888, I will say I refuse to accept such discharge, as it is not in accordance with the terms of our contract, which provides for thirty days' notice before such discharge can take effect, and I consider the boat is still under charter to Messrs. H. G. Jordan & Co. until said thirty days expire, which will be Jan. 8, 1889.

"Very respectfully yours,
"W. M. TEBO,
"H."

The plaintiff claimed to recover the contract-price for services from October 26, 1888, to January 8, 1889:

| | | |
|---|---|---|
| Amounting to....................... | | $5,426 64 |
| Less cash paid by defendants........ | $2,059 00 | |
| Earned by tug between December 8 and January 8 ................. | 725 00 | |
| | | 2,784 00 |
| Plaintiff's claim.............................. | | $2,642 64 |

The defendants assert that they were liable only for the service of the tug from October twenty-sixth to December eighth, at the contract-price:

| | | |
|---|---|---|
| Amounting to...................... | | $3,226 64 |
| Cash paid........................ | $2,059 00 | |
| Damages to barges................ | 1,167 64 | |
| | | 3,226 64 |

The defendants allege, in their answer, that the strandings were caused by the unseaworthiness of the tug and the negligence of its officers and pilot, who were, it is averred, incompetent. At the close of the evidence a verdict was directed for the defendants.

*William. W. Goodrich*, for the plaintiff, appellant.

*Joseph A. Shoudy*, for the defendants, respondents.

FOLLETT, J.:

Under this charter-party, the law implies a warranty by the owner (the plaintiff) that the tug was seaworthy. (*Putnam* v. *Wood*, 3 Mass., 481–485); *Kopitoff* v. *Wilson*, 1 Q. B. Div., 377–380; *Cohn* v. *Davidson*, 2 id., 455; *The Omoa Coal and Iron Co.* v. *Huntley*, 2 C. P. Div., 464; 1 Par. Mar. L., 238.) A vessel which is not commanded by competent officers is unseaworthy. (*Walden* v. *Firemens' Ins. Co.*, 12 John., 128–134; *Draper* v. *Commercial Ins. Co.*, 4 Duer., 234; 2 Par. Mar. L., 135.)

The plaintiff was not a common carrier and liable as an insurer of the safety of the barges, but he was liable for the damages occasioned by the failure of the master of the vessel to exercise reasonable care and skill in its management. (*The "Margaret,"* 94 U. S., 494–496; *The Steamer "Webb,"* 14 Wall., 406; *Wells* v. *The Steam Navigation Co.*, 8 N. Y., 375.) On this trial, the defendants did not attempt to show that the vessel was unseaworthy by reason of defects in its hull, machinery or material equipment, but rested their defense solely on the ground that the captain and pilot were incompetent and negligent. In reviewing the evidence given on the former trial, it was held (62 Hun, 514) that the trial court should have decided, as a matter of law, that the captain was negligent: (1.) In not anchoring his fleet at Handkerchief light instead of proceeding on his voyage in the night with a thick haze. (2.) In not

taking soundings between Handkerchief and Shovelful lights, which are three to three and one-half miles apart.

On the present trial the evidence seems to have been greatly changed. After the plaintiff proved his contract and introduced the letters of December eighth and twelfth, and the necessary formal evidence he rested. . The defendant called the captains of the two barges and their superintendent of the tow who was on board of the tug at the time of the accident. Jones, the captain of the barge, George Moon, testified: "The captain was justified, in my opinion, in going on instead of anchoring. He was justified in going on if he knew the course and had a pilot aboard who was familiar with the course. I saw no necessity of anchoring nor of their sheering over to port. I didn't know what they sheered over for, no idea at all."

Hendrickson the captain of the Charter Oak testified: There was no fog; that he saw the lights known as Shovelful, Monomoy and Pollock Rip. "I saw nothing in the condition of the wind or weather to require him (captain of the tug) to anchor. I thought it was good navigation for him to go ahead."

Van Cleaf testified that it was a clear dark night. "I say that originally starting for Shovelful light was good navigation." "There was nothing in the weather that in my opinion, required them to stop and anchor. They could have gone on perfectly easily. Any navigator could see where they were." He also testified that he, the captain of the tug, and its pilot all saw Handkerchief and Monomoy lights.

George M. Hallett, a sea captain, called by defendants, testified: That he was familar with the course from Handkerchief light to Boston. He said: "I should say that on a dark night with all the lights plainly visible — distinctly visible — a man who is familiar with the course should not have any difficulty in going over the course without running aground if he is familiar with it. I don't see why he should. I don't know of any reason if he knows all the lights."

Huling, another navigator called by the defendants, testified: "If there was a haze on the water so I would not see the Shovelful light vessel at all, for any reason, and I could see the Monomoy light distinctly, I would have some difficulty in going through safely with

the Monomoy light in view. I could not steer the proper course with the aid of that light to carry me on. In that case I would anchor and wait until I could see the other lights. I would turn to the anchorage if the weather was so you could not see. I would not go blindfolded." * * * "I never anchored a long tow in that place; I have passed over there in a haze, I don't know any one instance that I can call to mind now of passing over there when I could not see the Shovelful and could see the Monomoy."

This is substantially all the evidence given in behalf of the defendants which bears upon the question as to whether the plaintiff's captain was negligent in not anchoring at Handkerchief light.

The plaintiff's captain testified: "I did not anchor, because I didn't think it was prudent to anchor," etc. "It would not be good navigation to anchor her there." "It wouldn't have been safe to anchor there at all; it would be in the track of vessels, which is against the law."

Barnard, who was piloting the tug, testified: "That he had been a sea-faring man since boyhood; had sailed over this route not less than a hundred times, and, in my judgment, the course of navigation which we took was good navigation, I think." "It would not have been a prudent thing to have anchored the vessel after passing Handkerchief light."

Curran, a sea captain, testified: "Q. You don't think it would have been good navigation to have anchored? A. No, sir." * * * "It all depends upon the weather; if I saw Monomoy light clearly there would be no difficulty in going forward, if I did not see Shovelful light, and it would be prudent to go ahead then."

Under this state of the evidence it is impossible to sustain the ruling that, as a matter of law, the plaintiff's captain was negligent in not anchoring his tow at Handkerchief light. The question was one of fact and should have been submitted to the jury.

In admiralty cases the court may determine the law and the facts and the decisions of those courts afford but little light upon the question whether, under the practice in this State, an issue should be decided by the court as a matter of law or left to the jury as a question of fact, and, unless those cases are considered with reference to the difference in practice of the two courts, they are likely to mislead the investigator.

Whether it was negligent not to sound between Handkerchief and Shovelful lights was a disputed question of fact which should have been submitted to the jury. Again, the proximate cause of the stranding on Handkerchief shoals seems to have been, under the evidence in this case, the shifting of the course of the vessel after passing Handkerchief light, from one and a half to four points to the westward, which brought the vessels on the shoals. The captain and the pilot of the tug testified that the course was changed one and a half to two points to the westward, while the defendants' witnesses testified that it was changed four points to the westward. The difference in this narrow channel is not unimportant. All of the witnesses agree that when the course was changed the wind was blowing and tide flowing from the westward. The plaintiff's witnesses testified that the change was made to counteract the assumed force of the wind and tide and for the purpose of avoiding Stonehouse shoal, a dangerous one, which lay on the east side of the channel. By how much the course was changed was a question of fact, and also whether the change actually made, whatever found to be, was negligent. The judgment should be reversed and a new trial granted, with costs to appellants to abide the event.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Judgment reversed and new trial granted, with costs to appellant to abide event.